PER CURIAM.
The United States appeals the order of the Court of Federal Claims holding that it could assert jurisdiction over Zoltek Corporation’s (“Zoltek”)’s patent infringement allegations by treating the action as a Fifth Amendment taking under the Tucker Act. Zoltek cross-appeals the trial court’s ruling that 28 U.S.C. § 1498(c) bars this action as arising in a foreign country. The Court of Federal Claims certified the rulings under 28 U.S.C. § 1292(d)(2), and this court accepted jurisdiction. See Zoltek Corp. v. United States, No. 96-166 C (Fed. Cl. Feb. 20, 2004) (certification); see generally Zoltek Corp. v. United States, 58 Fed.Cl. 688 (2003), Zoltek Corp. v. United States, 51 Fed.Cl. 829 (2002).
We conclude that under § 1498, the United States is liable for the use of a method patent only when it practices every step of the claimed method in the United States. The court therefore affirms the trial court’s conclusion that § 1498 bars Zoltek’s claims. However, we reverse the trial court’s determination that it had jurisdiction under the Tucker Act based on a violation of the Fifth Amendment.
I.
Zoltek Corporation (“Zoltek”) is the as-signee of United States Reissue Patent No. 34,162 (reissued Jan. 19, 1993) to a “Controlled Surface Electrical Resistance Carbon Fiber Sheet Product” (“the Re ’162 patent”). The Re ’162 patent claims certain methods of manufacturing carbon fiber sheets with controlled surface electrical resistivity.[1]
Independent claim 1 is representative. After reissue, it reads:
1. A method of manufacturing a plurality of different value controlled resis *1348 tivity carbon fiber sheet products employing a carbonizable fiber starting material; said method comprising
selectively partially carbonizing previously oxidized and stabilized fiber starting material
for a predetermined time period in an oxygen free atmosphere within a furnace at selected temperature values within a temperature range from 370 degrees Centigrade to about 1300 degrees Centigrade
by soaking the stabilized fiber starting material at the selected temperature for the predetermined period of time
to provide a preselected known volume electrical resistivity to the partially carbonized fibers corresponding to that volume electrical resistivity value required to provide the preselected desired surface resistance value for the finished sheet products,
and thereafter processing the partially carbonized fibers into homogeneous carbon fiber sheet products having the preselected desired surface electrical resistances.
Re ’162 patent, col. 8,11. 42-66.
The method thus takes a “carbonizable fiber starting material” and requires “partially carbonizing” it. “Carbonization” as used in the Re ’162 patent means “a process which involves heat treatment in an inert atmosphere which eliminates or removes all elements other than carbon.” Zoltek, 48 Fed.Cl. 290, 293 (2000). “Partial carbonization” refers to carbonization sufficient to achieve a desired surface resistance in a sheet woven from the resulting fibers. Id. at 295.
Independent claim 11 describes a representative method for making such fibers and weaving them into a fiber sheet. After reissue, it reads:
11. A method of manufacturing a plurality of different value controlled resistivity carbon fiber sheet products employing carbonizable, previously oxidized and stabilized fiber starting material; said method comprising
forming an oxidized and stabilized tow, stretching and breaking the stabilized tow,
forming the stabilized stretched and broken fiber filaments into sliver comprised of,
large bundles of discontinuous filaments in an untwisted condition,
converting the sliver into roving, spinning the roving into a spun yarn, plying or twisting the spun yarn, weaving or knitting the plied and twisted spun yarn into fabric,
and selectively partially carbonizing the fabric thus formed at preselected elevated temperature values for a predetermined time period in an oxygen free atmosphere within a furnace having a continuously increasing temperature profile within the range from about 370 degrees Centigrade to about 1300 degrees Centigrade to provide a known preselected electrical volume resistivity to the partially carbonized fiber filament in the fabric corresponding to that value of electrical volume resistivity required to provide the preselected desired surface resistance for the finished fabric.
Re 162 patent, col. 9, 1. 65—col. 10, 1. 24.
Independent claim 15 describes a method for making and processing the fibers into paper-like sheet products. Id. at col. 10,1. 35—col. 11,1. 8. In short, the steps of the claimed methods are directed to “par *1349 tially carbonizing” fibers, and weaving or processing them into controlled resistivity carbon fiber mats or sheets.
The relevant facts are undisputed. The United States contracted with Lockheed Martin Corporation (“Lockheed”) to design and build the F-22 fighter. Zoltek, 51 Fed.Cl. at 831. Lockheed subcontracted for two types of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material made from Ni-calon silicon carbide fibers. These fibers are partially carbonized and manufactured into sheets in Japan, which are then imported into the United States. The second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are manufactured exclusively in Japan, but they are processed into mats in the United States. Zoltek, 58 Fed.Cl. at 690.
Zoltek brought suit in the Court of Federal Claims under § 1498(a), alleging that the United States and Lockheed used the methods claimed in the Re T62 patent when Lockheed’s subcontractors made the two silicide fiber products used in the F-22. Zoltek alleges that the mats and sheets were made, for the United States, using the claimed methods.
The government moved for partial summary judgment that Zoltek’s § 1498(a) claims were barred by § 1498(c) because they arose in Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred Zoltek’s claims under § 1498(a), the trial court directed Zoltek to amend its complaint to allege a taking under the Fifth Amendment. Id. at 707. The trial court concluded that Zoltek could assert the infringement claims under 28 U.S.C. § 1491(a)(1) as a taking in violation of the Fifth Amendment. Id. at 690-91 & 695-706. The trial court certified its § 1498 analysis and its holding that Zol-tek’s patent infringement claims sounded in the Fifth Amendment, under § 1292(d)(2). Both parties timely sought permission to appeal. This court accepted the interlocutory appeals and has jurisdiction under 28 U.S.C. §§ 1292(c)(1) and 1295(a)(3).
The issues before the court are purely questions of law. This court reviews the trial court’s statutory and constitutional analysis without deference. See Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1345 (Fed. Cir.2004).
II.
The federal government is immune from any legal action by its sovereign immunity. See United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (stating that “[t]he United States, as sovereign, is immune from suit save as it consents to be sued”). The waiver of immunity can be limited and conditioned by the Congress. See United States v. Nordic Village Inc., 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (stating that the government’s consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee’s judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498.[2] Section 1498(a) provides, in pertinent part:
*1350 Whenever an invention described in and covered by a patent of the United States is used ... by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner’s remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.
Id. (emphasis added).
This court has held that “direct infringement under section 271(a) is a necessary predicate for government liability under section 1498.” NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1316 (Fed.Cir.2005) (citing Motorola, Inc. v. United States, 729 F.2d 765, 768 n. 3 (Fed.Cir.1984)). We have further held that “a process cannot be used 'within’ the United States as required by section 271(a) unless each of the steps is performed within this country.” Id. at 1318. Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court’s conclusion that § 1498(a) bars Zoltek’s claims.
III.
We turn to the trial court’s takings analysis. The Court of Federal Claims held that Zoltek could bring its action against the government under the Tucker Act, by alleging that the infringement was a taking of private property for public use under the Fifth Amendment. See Zoltek, 58 Fed.Cl. at 707. We reverse.
In Schillinger v. United States, 155 U.S. 163, 30 Ct.Cl. 480, 15 S.Ct. 85, 39 L.Ed. 108 (1894), the Supreme Court rejected an argument that a patentee could sue the government for patent infringement as a Fifth Amendment taking under the Tucker Act. Id. at 169, 15 S.Ct. 85. Schillinger remains the law.
The trial court determined that the Supreme Court “effectively overruled Schil-linger sub silentio ” in Crozier v. Fried. Krupp Aktiengesellschaft, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771 (1912). Zoltek, 58 Fed.Cl. at 702. We disagree. The Court of Federal Claims, like this court, is bound by Schillinger, and the trial court rulings to the contrary are not viable.
Crozier involved Army weapons manufacture. Fried. Krupp was a German corporation holding patents relating to improvements in guns and gun carriages. William Crozier was the Army Chief of Ordnance and directed the manufacture of field guns and carriages for the Army. In 1907, Fried. Krupp sued Crozier in the supreme court of the District of Columbia. The company alleged that the Army’s weapons manufacture was infringing Fried. Krupp patents. Although the complaint originally sought preliminary and permanent injunction, and an accounting, the company later dropped the prayer for preliminary injunction and waived the prayer for accounting. Crozier, 224 U.S. at 297-99, 32 S.Ct. 488. Crozier demurred, arguing that the real party in interest was the United States, and that *1351 the trial court lacked jurisdiction. Id. at 300, 32 S.Ct. 488. The trial court sustained the demurrer and dismissed. Id. In 1908, the Court of Appeals reversed. Id.
Before the Supreme Court heard argument, Congress enacted the Patent Act of 1910. See Pub.L. No. 61-305, 36 Stat. 851 (1910) (later codified as amended at § 1498). When it eventually heard the case, the Supreme Court reversed and remanded with instructions to dismiss so that the company could refile and proceed in the Court of Claims under the 1910 Act. Crozier, 224 U.S. at 309, 32 S.Ct. 488.
The contention that Crozier somehow overruled Schillinger, and recognized patent infringement as a Fifth Amendment taking, is flawed. The only question before the Supreme Court was whether the trial court had jurisdiction to enjoin the government from alleged patent infringement. Because Congress, in adopting the 1910 Act, precluded injunctive relief against the government for patent infringement, the Crozier court concluded that the trial court lacked the power to grant Fried. Krupp the injunctive relief it was seeking. Id. at 308, 32 S.Ct. 488. None of the relevant Schillinger issues were joined: Crozier was not filed in the Court of Claims, had nothing to do with the Tucker Act, did not allege a taking, and was solely in equity. Moreover, discussing the state of the law before the 1910 Act, the Crozier court expressly noted that no patent infringement action could be brought against the government unless in the Court of Claims under a contract or implied contract theory. See id. at 304, 32 S.Ct. 488. Far from “overruling” Schillinger, this acknowledges and endorses the rule that Schillinger established. The Court thus recognized that by enacting the 1910 Act, Congress “addfed] the right to sue the United States in the court of claims” for patent infringement. Id. If the right already existed under the Fifth Amendment, as the trial court here suggests, then this analysis in Crozier would be flawed.
Indeed, the Supreme Court repeated this characterization of the 1910 Act just eight years later. See William, Cramp & Sons Ship & Engine Bldg. Co. v. Int’l Curtis Marine Turbine Co., 246 U.S. 28, 41, 38 S.Ct. 271, 62 L.Ed. 560 (1918) (citing Schillinger and explaining that the 1910 Act “was intended alone to provide for the discrepancy resulting from the right in one case to sue on the implied contract and the non-existence of a right to sue” for infringement). In Crozier and Cramp, the Supreme Court therefore acknowledged Congressional recognition that the Court of Claims lacked Tucker Act jurisdiction over infringement under a takings theory. The legislative history of the 1910 Act confirms that the statute augmented the Court of Claims’ Tucker Act jurisdiction by providing jurisdiction over the tort of patent infringement. See H.R.Rep. No. 61-1288 at 3 (1910).
The Court of Federal Claims reasoned that because Crozier discussed the 1910 Act in terms of eminent domain, the Supreme Court must have reconsidered its analysis in Schillinger. This reasoning is misplaced. It is true that Crozier, and several cases applying the 1910 Act (in its original form and as amended and recodi-fied at § 1498), analyze the statute in terms of takings and protecting property rights. Under this case law, patent infringement by the government is analogized to “taking” a “compulsory license.” The view is consistent with the text of the 1910 Act, which provided for reasonable compensation for patent infringement, 36 *1352 Stat. 851, and with the legislative history, which provided that the purpose of the bill was “to enlarge the jurisdiction of the Court of Claims so that said court may entertain suits against the United States for the infringement or unauthorized use of a patented invention, in certain cases, and award reasonable compensation to the owner of the patent.” H.R.Rep. No. 61-1288, at 1 (1910).
But when interpreting the Constitution “[i]t is emphatically the province and duty of the judicial department to say what the law is.” Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). That Congress may adopt a limited waiver of sovereign immunity and confer rights on patentees for money damages against the government, whatever the rationale, cannot disturb the Supreme Court’s analysis of the Fifth Amendment in Schillinger. Neither the wording nor rationale of the 1910 Act, nor the Supreme Court’s discussion of it in Crozier, affects the rule in Schillinger. Of course, the 1910 Act was not even before the Crozier court, as the action was filed three years before the Act was enacted. Even the plain language of the 1910 Act—entitled “An Act To Provide Additional Protection For Owners of Patents of the United States”—belies the trial court’s analysis here, as it legislates against the background of the Schillinger legal framework.
In sum, the trial court’s conclusion that Crozier “effectively overruled Schil-linger sub silentio ” has no merit. The trial court’s remaining conjectures on takings jurisprudence do not require consideration. We simply note that to reach its conclusion the Court of Federal Claims had to read an entire statute, § 1498, out of existence—a result that betrays the error in the trial court’s analysis. As the Supreme Court has clearly recognized when considering Fifth Amendment taking allegations, “property interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.” Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (citations omitted).[3] Here, the patent rights are a creature of federal law. In response to Schillinger, Congress provided a specific sovereign immunity waiver for a patentee to recover for infringement by the government. Had Congress intended to clarify the dimensions of the patent rights as property interests under the Fifth Amendment, there would have been no need for the new and limited sovereign immunity waiver. The manner in which Congress responded to Schillinger is significant. “The life of the law has not been logic; it has been experience.”[4] Neither the Court of Federal Claims nor this court can ignore the path of the patent law as it has evolved under § 1498.
The dissent argues that we are wrong to conclude that Schillinger remains good *1353 law. Both inverse condemnation claims and regulatory takings claims, it asserts, are currently viewed as claims founded upon the Fifth Amendment of the Constitution for purposes of the Tucker Act, and these claims are not barred for having arisen in tort. If, as the dissent argues is suggested by Crozier, a patent is a type of property that comes within the ambit of Fifth Amendment Takings Clause protection, why should we not likewise permit claims for patent infringement to arise under the Tucker Act?
The answer is simple. Unlike regulatory takings and the inverse condemnation of real property, the “taking” of a license to use a patent creates a cause of action under § 1498. The dissent fails to appreciate that this destroys whatever force its argument by analogy may otherwise have had. Indeed, if we were to interpret § 1491 as the dissent would have us, it would render superfluous § 1498—the remedy that Congress fashioned specifically to compensate patentees for the use of their patents by the federal government. Moreover, even if we shared the dissent’s belief that the Supreme Court would overrule Schillinger, we are nevertheless bound by its holding. It is not our place to overrule sub silentio the Supreme Court. See Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (“If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.”). In sum, the trial court erred in finding that Zoltek could allege patent infringement as a Fifth Amendment taking under the Tucker Act, and we reverse.
IV.
For the reasons set forth herein, we affirm the trial court’s conclusion that the infringement allegations at bar are precluded by § 1498(a). We reverse the trial court’s ruling that Zoltek can allege patent infringement as a Fifth Amendment taking under the Tucker Act. We remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

Each side will bear its own costs.

. Although the Re '162 patent also includes various product-by-process and product claims, only the method claims are at issue here. In a March 5, 2001 motion for leave to file a first amended complaint, Zoltek abandoned its allegations that the government had infringed the product claims. See Zoltek, 58 Fed.Cl. at 689 n. 3.

. As the Supreme Court recognized at least as long ago as 1881, the patentee’s recourse for infringement by the government is limited by the scope of the waiver of sovereign immunity established by the Congressional consent to be sued. “If the jurisdiction of the Court of *1350 Claims should not be finally sustained [to hear an infringement action against the government], the only remedy against the United States, unless Congress enlarges the jurisdiction of that court, would be to apply to Congress itself.” James v. Campbell, 104 U.S. 356, 359, 26 L.Ed. 786 (1881). In short, the power to limit a Congressional abuse of sovereign immunity lies in the political process rather than the judicial branch.

. In Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003-04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), the Court concluded that government interference with interests "cognizable as trade-secret property right[s]” could constitute a taking depending on the circumstances. But Monsanto did not overrule Schillinger, and we must follow Schillinger until it is overruled by the Supreme Court, whether or not Schillinger is viewed as inconsistent with Monsanto. See Indep. Ink, Inc. v. Ill. Tool Works, Inc., 396 F.3d 1342, 1351 (Fed.Cir.2005), cert. granted, -U.S. -, 125 S.Ct 2937, 162 L.Ed.2d 865 (2005).

. Oliver W. Holmes, The Common Law 5 (M. Howe ed.1963) (1881).